

# Fourth Court of Appeals
### San Antonio, Texas

## MEMORANDUM OPINION

No. 04-13-00235-CV

In the **MATTER OF J.D.H.M.**

From the 289th Judicial District Court, Bexar County, Texas
Trial Court No. 2011JUV00227
The Honorable Carmen Kelsey, Judge Presiding

Opinion by:    Marialyn Barnard, Justice

Sitting:        Catherine Stone, Chief Justice
                Marialyn Barnard, Justice
                Patricia O. Alvarez, Justice

Delivered and Filed: March 19, 2014

AFFIRMED

Appellant J.D.H.M. appeals an order of transfer, transferring him from the Texas Juvenile Justice Department (TJJD) to the Texas Department of Criminal Justice–Institutional Division (TDCJ). On appeal, J.D.H.M. raises a single point of error, contending the juvenile court erred when it transferred him to TDCJ because the record establishes he should have been placed on parole with conditions. We affirm the trial court's judgment.

## BACKGROUND

According to documents in the record, J.D.H.M. received a call from a female individual asking him if he wanted some marijuana. The female claimed she knew a drug dealer they could rob. The female individual and a male individual picked up J.D.H.M., who claimed to be using Xanax and marijuana that day. The male individual had a gun. When the three arrived at the drug

dealer's house, only J.D.H.M. went inside — he took the gun with him. Once inside, J.D.H.M. pointed the gun at the individuals in the house and demanded marijuana, a scale, and the television.[1] One of the individuals in the home carried the television outside and loaded it into the waiting car. J.D.H.M. and the others left.

Ultimately, J.D.H.M. was arrested. The State filed a petition alleging J.D.H.M. engaged in delinquent conduct in that he committed an aggravated robbery. J.D.H.M. stipulated to the charge and pursuant to a plea bargain agreement with the State, the juvenile court committed J.D.H.M. to TJJD for a fifteen-year determinate sentence, with the possibility of transfer to TDCJ.

After J.D.H.M. spent approximately two years in the TJJD, the Executive Director of the TJJD advised the juvenile court that the agency was requesting J.D.H.M. be transferred to TDCJ because he would not have completed his minimum required stay at TJJD before his nineteenth birthday. After a hearing, the juvenile court ordered J.D.H.M. transferred to TDCJ to complete his sentence.[2] J.D.H.M. perfected this appeal.

## ANALYSIS

As noted above, J.D.H.M. contends that the trial court abused its discretion in transferring him to TDCJ rather than placing him on parole. We disagree.

### *Standard of Review*

We review a juvenile court's decision to transfer a juvenile from TJJD to TDCJ under an abuse of discretion standard. *In re L.G.G.*, 398 S.W.3d 852, 855 (Tex. App.—Corpus Christi 2012, no pet.); *In re J.J.*, 276 S.W.3d 171, 178 (Tex. App.—Austin 2008, pet. denied). A trial court abuses its discretion if it acts without reference to guiding rules or principles of law. *See id.*

---

[1] In another portion of the record, it states J.D.H.M. demanded only the television.

[2] Once the Executive Director of the TJJD refers a juvenile for transfer, the juvenile court must hold a hearing to determine whether transfer for completion of a determinate sentence is appropriate. TEX. FAM. CODE ANN. § 54.11(a), (i) (West Supp. 2013).

In determining whether there was an abuse of discretion, we review the entire record. *Id.* "If *some* evidence exists to support the juvenile court's decision, there is no abuse of discretion." *L.G.G.*, 398 S.W.3d at 855 (emphasis added); *see In re D.L.*, 198 S.W.3d 228, 229 (Tex. App.—San Antonio 2006, pet. denied). We will not substitute our judgment for that of the juvenile court, and we will not reverse a decision by the juvenile court simply because we would have decided the matter differently. *L.G.G.*, 398 S.W.3d at 855.

### *The Evidence*

At the transfer hearing, the State called Leonard Cucolo, the TJJD court liaison. Mr. Cucolo had prepared a summary report that was submitted to the juvenile court prior to the hearing. Mr. Cucolo began by noting that in 2010, prior to J.D.H.M.'s adjudication for the aggravated robbery, J.D.H.M. had prior adjudications for possession of marijuana and evading arrest. Although J.D.H.M. did well academically while in TJJD — obtaining a GED, vocational certificates, and attending some college courses — his behavior had been a concern, causing Mr. Cucolo to recommend a transfer to TDCJ.

According to Mr. Cucolo, while in custody, J.D.H.M. "engaged in nine major rule violations." Mr. Cucolo stated major rule violations are new offenses committed by a juvenile while confined in a TJJD facility that usually involve "some type of aggressive conduct." In J.D.H.M.'s case, the rule violations included assaults and possession of marijuana and other contraband. Mr. Cucolo stated this behavior by J.D.H.M. was "pretty consistent and severe throughout his stay." However, Mr. Cucolo admitted that during the last six months, there was a reduction in J.D.H.M.'s severe behavior. Nevertheless, he had engaged "in some pretty serious behavior while he's been confined . . . ." Mr. Cucolo described it as a pattern of behavior.

Mr. Cucolo testified J.D.H.M. had seventy-six documented incidents of misbehavior, and sixty-two of those resulted in referrals to security. In addition, there were forty incidents of

program disruption. There were five assaults and three incidents of fighting. With regard to the assaults, there were times when J.D.H.M. was the aggressor, assaulting other juveniles within the facility. J.D.H.M. was also aggressive with TJJD staff, and in one incident, took documents belonging to the facility and destroyed them.

Mr. Cucolo testified J.D.H.M. had yet to advance to the Youth Empowerment Stage of the program, which is the parole readiness stage. Once in this stage, the juvenile is considered ready for parole because he has been actively participating in daily groups, continues to work and complete academic objectives, and his behavior remains stable. J.D.H.M. was able to complete the alcohol and drug program on his second attempt. He was removed from the program the first time because of his behavior. J.D.H.M. also completed the "aggression replacement training program," basically an anger management program. Despite the completion of this program, his aggressive conduct continued, though admittedly J.DH.M.'s last behavioral incident was several months before the transfer hearing.

When asked about family support if J.D.H.M. was released on parole, Mr. Cucolo testified he was only aware of a grandmother — J.D.H.M.'s mother passed away a few months before the hearing. Thus, J.D.H.M. would be sent to a halfway house with little or no family support, still having issues with aggression and substance abuse, making him a danger to the community and himself.

Although the facility, the Giddings State School, recommended parole for J.D.H.M., Mr. Cucolo recommended transfer to TDCJ. Mr. Cucolo said his decision was not easy for him, but considering J.D.H.M.'s behavior during confinement, his previous history, and the lack of family support, he had no choice because J.D.H.M. is "too much of a risk right now and not ready for release." The Executive Director of the TJJD, on behalf of the agency, joined Mr. Cucolo's recommendation.

In support of parole, J.D.H.M. called Dr. Enrique Covarrubias as a witness. Dr. Covarrubias, a psychologist with the Giddings State School, performed a psychological evaluation of J.D.H.M. and prepared a report, which was considered by the juvenile court. Dr. Covarrubias testified he spent two days evaluating J.D.H.M. He also consulted with facility staff. Both the doctor and the facility recommended parole.

Dr. Covarrubias testified that at the time of the evaluation, J.D.H.M. was working in the cafeteria. He had received a certification in "automotive service excellence" and was taking vocational classes. The doctor documented only fifty-six incidents of misbehavior, explaining that he did not consider self-referrals, any incident overturned on appeal, or security extensions — extensions of stays in security when the juvenile was already in security for some other reason. Dr. Covarrubias stated he does not include such incidents because they are not "necessarily misbehavior."

The doctor stated he has seen "quite a bit of improvement" in J.D.H.M.'s behavior over time, noting J.D.H.M. entered the facility with a ninth grade education, but obtained his GED and completed several facility programs. He was also taking "some college exam, entrance exam." J.D.H.M. told the doctor he wanted to take college courses, knew there were "loan programs" that might allow him to do so, and would be willing to work any job to pay for it. The doctors said the discussion about financial planning was something he does not typically "hear from other kids." J.D.H.M. received a vocational certification and was a peer mediator. Dr. Covarrubias said he saw J.D.H.M. as "a youth with a lot of resilient factors considering his history." The doctor then provided details about J.D.H.M.'s childhood.

When J.D.H.M. was a young boy, he was abused and neglected; his family had an extensive history with Child Protective Services. J.D.H.M.'s parents had substance abuse problems that led to legal issues. His father died at age thirty-five, and his mother and best friend passed away in

the months before the transfer hearing. All of these losses caused J.D.H.M. "grief related issues." According to Dr. Covarrubias, J.D.H.M. has family support from his grandmother, and he also "talks quite a bit to his brother." The doctor said he mentioned other family members, but they did not really focus on them.

With regard to J.D.M.H.'s "Individualized Case Plan," which the doctor described as a report card for the juveniles, he was originally identified as high risk, but he made improvement. Although J.D.M.H. has behavior problems, he felt remorse, and the doctor felt he was functioning at a high level. The doctor testified he believed J.D.H.M. would be more successful in a halfway house than in prison. Dr. Covarrubias felt J.D.H.M. needed the structure a halfway house would provide: curfew, drug testing, and demands to work. If J.D.H.M. went to prison, the doctor feared he would lose the ground he had gained in the TJJD facility.

J.D.H.M.'s maternal grandmother testified on his behalf. She provided information on his difficult childhood and his mother's instability. According to the grandmother, J.D.H.M.'s father was emotionally abusive to J.D.H.M. and his mother. She described the father as "a bit of a control freak person." He isolated J.D.H.M. and his mother from the mother's family. After J.D.H.M.'s father died, his mother had trouble — "single parenting . . . was more than she could handle." J.D.H.M.'s mother was unable to maintain a job.

Both his grandmother and two of his maternal aunts testified they have seen improvement in J.D.H.M. since his placement in TJJD. The grandmother stated that when J.D.H.M.'s mother was hospitalized before her death, J.D.H.M. came to the hospital and the grandmother "saw a different human being." J.D.H.M. was calmer, his eyes were softer, and he embraced the family, seeming to trust them. His grandmother testified that if he were paroled, she and her four sisters would be supportive, but she believed a controlled environment, such as a halfway house, would

be appropriate. She described J.D.H.M. as capable and bright, a leader who simply made "some horrible choices."

### *Application*

In determining whether a juvenile should be transferred, the juvenile court may consider several factors, including:

- the experiences and character of the juvenile before and after commitment to TJJD;

- the nature of the offense the juvenile committed and the manner in which it was committed;

- the abilities of the juvenile to contribute to society;

- the protection of the victim of the offense or any member of the victim's family;

- the recommendations of the TJJD and the prosecutor;

- the best interests of the juvenile; and

- any other factor relevant to the issue to be decided.

TEX. FAM. CODE ANN. § 54.11(k). Although the court may consider these factors, it is not required to consider each one, and is expressly permitted to consider relevant factors not set forth in section 54.11(k). *J.J.*, 276 S.W.3d at 178; *see* TEX. FAM. CODE ANN. § 54.11(k).

The record establishes the juvenile court looked at the evidence in light of the relevant section 54.11(k) factors. The court noted "the good things" J.D.H.M. accomplished, but recalled that at the time of sentencing, she warns those like J.D.H.M. with determinate sentences about their behavior and its possible ramifications with regard to subsequent transfers to TDCJ. The juvenile court stated it was possible J.D.H.M.'s behavior had changed simply because he realized he was turning nineteen and he would have to come back to court with regard to a transfer to TDCJ.

Considering J.D.H.M.'s offense — aggravated robbery — and his extensive behavioral issues during his time in TJJD, coupled with the recommendations from Mr. Cucolo and TJJD, we cannot say the juvenile court abused its discretion in ordering J.D.H.M. transferred to TDCJ. Mr. Cucolo presented evidence that J.D.H.M. was not a good candidate for even structured parole based on his behavioral problems while at TJJD, his drug and alcohol issues, and the fact that he had not yet fulfilled the minimum three years of his sentence. Although Dr. Covarrubias thought that it was in J.D.H.M.'s best interest to be released into a structured parole environment based on his recent behavioral improvements, mental stability, and academic success, the court did not find his opinion compelling, perhaps because J.D.H.M's recent improvement was at a time when he knew transfer was possible.

Clearly, there was some evidence to support the juvenile court's decision to transfer J.D.H.M. to TDCJ as opposed to releasing him on parole. Because there was some evidence to support the court's decision, we hold there was no abuse of discretion. *See L.G.G.*, 398 S.W.3d at 855; *D.L.*, 198 S.W.3d at 229.

## CONCLUSION

Based on the foregoing, we overrule J.D.H.M.'s point of error and affirm the trial court's judgment.

Marialyn Barnard, Justice